**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| APPLIED UNDERWRITERS, INC., a Nebraska Corporation; APPLIED RISK SERVICES, INC., a Nebraska Corporation, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> RICARDO LARA, Insurance Commissioner for the State of California, in his official capacity; KENNETH SCHNOLL, California Dept. of Insurance Deputy Commissioner, in his official capacity; BRYANT HENLEY, California Dept. of Insurance Deputy Commissioner, in his official capacity, <br> *Defendants-Appellees.* | No. 21-15679 <br><br> D.C. No. <br> 2:20-cv-02096-WBS-AC |

CALIFORNIA INSURANCE COMPANY, a New Mexico corporation,
*Plaintiff-Appellant*,

v.

RICARDO LARA, Insurance Commissioner for the State of California, in his official capacity; KENNETH SCHNOLL, California Department of Insurance Deputy Commissioner, in his official capacity; BRYANT HENLEY, California Department of Insurance Deputy Commissioner, in his official capacity,
*Defendants-Appellees.*

No. 21-16159

D.C. No.
2:21-cv-00030-
WBS-AC

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted December 7, 2021
Pasadena, California

Filed June 10, 2022

Before:  Marsha S. Berzon, Carlos T. Bea, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Bea;
Concurrence by Judge Nguyen

# SUMMARY[*]

## Civil Rights/Federal Judicial Abstention

The panel affirmed the district court's dismissal of an action brought under 42 U.S.C. § 1983 against the California Insurance Commissioner alleging various constitutional violations arising out of the conservatorship of the California Insurance Company, an insurance company in the State of California which partnered with appellants to sell, among other things, workers' compensation insurance.

The California Insurance Commissioner filed an ex parte conservation application in the Superior Court of San Mateo to place the California Insurance Company (CIC I) in a conservatorship after CIC I's president, Steven Menzies, attempted to consummate a purchase transaction with Berkshire Hathaway without the Commissioner's approval, and then attempted to bypass the California insurance regulatory scheme by merging CIC I with the California Insurance Company (CIC II), a New Mexico-domesticated shell company formed by Menzies. The Superior Court granted the Commissioner's conservatorship application and appointed the Commissioner as Conservator of CIC I. After CIC I unsuccessfully challenged the bases of the conservatorship in state court, Applied Underwriters, of which Menzies is the Chief Executive Officer, and CIC II filed separate actions in federal court asserting causes of actions under § 1983.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The district court dismissed both actions pursuant to Federal Rule of Civil Procedure 12(b)(1) on the basis that it lacked jurisdiction to hear the cases under both the *Younger* abstention doctrine and the prior exclusive jurisdiction rule.

The panel held that because important considerations of federalism were at stake, the district court's reliance on *Younger* abstention as a ground for dismissal was in error. The panel held that an insurance conservatorship is not sufficiently akin to a criminal prosecution to bring it within the purview of the Supreme Court's current understanding of what constitutes a similar, *Younger*-eligible "civil enforcement proceeding," making the application of *Younger* improper in this case.

The panel nevertheless held that dismissal of appellants' claims was warranted on account of the prior exclusive jurisdiction rule, which holds that when a court of competent jurisdiction has obtained possession, custody, or control of particular property, that possession may not be disturbed by any other court. In applying the prior exclusive jurisdiction rule, the panel determined that the insurance conservatorship was an in rem proceeding and that the federal actions seeking to end the conservatorship's control over CIC I's assets were either in rem or quasi in rem proceedings.

To the panel's knowledge, this was the first case in this Court implicating the prior exclusive jurisdiction rule in connection with a § 1983 action. The panel noted that limitations on the exclusive jurisdiction rule may be necessary in unusual circumstances in which the adjudication of constitutional rights might be compromised but concluded that this case did not present any such circumstances. Thus, appellants' interests were well represented in the conservatorship action; they had an

adequate opportunity to raise constitutional challenges; they failed to sufficiently allege that the conservatorship action was brought in bad faith; and they failed to demonstrate irreparable injury arising from extraordinary circumstances which might justify an exception to the prior exclusive jurisdiction rule. Accordingly, federal judicial abstention due to the San Mateo Superior Court's prior exclusive jurisdiction of the CIC I res was warranted.

Concurring in the result, Judge Nguyen agreed that affirming the district court's dismissal of these federal actions was warranted. But she wrote separately because, in her view, the district court correctly dismissed under *Younger* abstention. In reversing the district court's dismissal on this ground, the majority held that insurance conservatorships were not the type of civil enforcement proceedings to which *Younger* abstention applies. Judge Nguyen wrote that to the contrary, insurance conservatorships embody all of the characteristics which define that category. Rather than applying the *Younger* doctrine, which was tailor-made for this situation, the majority instead attempted to modernize the doctrine of prior exclusive jurisdiction. Because Judge Nguyen believed *Younger* abstention applied, she concurred only in the result.

## COUNSEL

Samuel C. Kaplan (argued), Boies Schiller Flexner LLP, Washington, D.C.; Maxwell V. Pritt, Beko O. Reblitz-Richardson, and Reed D. Forbush, Boies Schiller Flexner LLP, San Francisco, California; for Plaintiffs-Appellants.

Michael J. Strumwasser (argued), Dale K. Larson, Caroline Chiappetti, and Julia Michel, Strumwasser & Woocher LLP, Los Angeles, California; Cynthia J. Larsen, Justin Giovannettone, and Mark C. Smith, Orrick Herrington & Sutcliffe LLP, Sacramento, California; for Defendants-Appellees.

## OPINION

BEA, Circuit Judge:

In business, as in life, it is necessary to take risks. Indeed, fortune favors the bold.[1] Sometimes you win, sometimes you lose. And when you lose, the loss should be paid. Here, Steven Menzies, Chief Executive Officer of Applied Underwriters, Inc. ("Applied") and President of California Insurance Company ("CIC I"), made a $50 million bet with Berkshire Hathaway ("Berkshire") that he could complete the purchase of Berkshire's controlling interest in CIC I by September 30, 2019. Unfortunately for Menzies, the deal could not be completed in time, as the California Insurance Commissioner, Ricardo Lara ("Commissioner"), failed to approve the sale by that deadline.

---

[1] Virgil, *Aeneid*, 10:284.

Instead of accepting this loss, Menzies decided on a different approach. Menzies consummated the transaction with Berkshire without the Commissioner's approval, and then attempted to bypass the California insurance regulatory regime altogether by merging CIC I with New Mexico-domesticated California Insurance Company ("CIC II"), a shell company formed by Menzies to serve as the vehicle to effect CIC I's domestication outside of California. In response to Menzies's attempted out-of-state merger, the Commissioner filed an ex parte conservation application in the Superior Court of San Mateo to place CIC I in a conservatorship. That application was granted; the Superior Court appointed the Commissioner as the Conservator of CIC I. As Conservator, the Commissioner controlled CIC I and its assets, subject to the Superior Court approval. Subsequently, CIC I contested the grounds upon which the conservatorship was instituted by filing an application to vacate the order instituting the conservatorship in the Superior Court. CIC I claimed that the conditions cited for imposing the conservatorship no longer existed. The Superior Court denied CIC I's application. CIC I then sought a writ of mandate from the California Court of Appeal seeking to overturn the Superior Court's denial of CIC I's application to vacate the order instituting the conservatorship, and that petition for writ was also denied.

After CIC I unsuccessfully challenged the bases of the conservatorship in state court, both Applied and CIC II filed separate actions in federal court, asserting causes of action under 42 U.S.C. § 1983 alleging various constitutional violations. While characterized in various ways, the relief sought in both actions was the same—dissolution of the conservatorship of CIC I. The district court dismissed both actions pursuant to Federal Rule of Civil Procedure 12(b)(1), with each order holding that the district court lacked

jurisdiction to hear the cases under both the "prior exclusive jurisdiction" rule and the *Younger* abstention doctrine.

We have jurisdiction under 28 U.S.C. § 1291. We conclude that because important considerations of federalism are at stake, the district court's reliance on *Younger* abstention as a ground for dismissal was in error. An insurance conservatorship is not sufficiently akin to a criminal prosecution to bring it within the purview of the Supreme Court's current understanding of what constitutes a similar, *Younger*-eligible "civil enforcement proceeding," thus making the application of *Younger* improper in this case. We nonetheless affirm the district court's dismissal based on the alternative ground relied upon, the prior exclusive jurisdiction rule. We also announce limitations to the prior exclusive jurisdiction rule, explaining how this doctrine would not provide an absolute bar to parallel federal court litigation if extraordinary circumstances were present, none of which are here present.

## I. BACKGROUND

Appellants Applied Underwriters, Inc. and Applied Risk Services (collectively, "Applied") partner with CIC I to sell workers' compensation insurance and various payroll, agency, and claim services. CIC I is an admitted insurer in the State of California,[2] which subjects it to regulation by the California Insurance Commissioner, a position currently held by Appellee Ricardo Lara. In January 2019, Steven Menzies, as Chief Executive Officer of Applied Underwriters, Inc. and as President of CIC I, entered into an

---

[2] *See* Cal. Ins. Code § 24 (defining "admitted" as "entitled to transact insurance business in this state, having complied with the laws imposing conditions precedent to transaction of such business").

agreement with Berkshire Hathaway to purchase Berkshire's controlling interest in CIC I (the "Agreement"). The Agreement included a $50 million "breakup fee" were the transaction not consummated by September 30, 2019.

California Insurance Code § 1215.2(d) requires the California Insurance Commissioner to approve any sale (or merger) of a controlling interest in an admitted California insurer, and further provides the Commissioner with 60 days to approve or disapprove such transactions upon submission of the information concerning the transaction required by § 1215.2(a). These required submissions are known as "Form A" submissions. On April 9, 2019, Menzies, acting on behalf of CIC I, submitted to the California Department of Insurance ("CDI") his first "Form A," which detailed the proposed Agreement and sought official approval. However, upon review, the CDI requested further information concerning the Agreement, requiring Menzies to withdraw the first Form A submission and to submit a second Form A on June 12, 2019. After this second Form A submission was found unsatisfactory, Menzies submitted his third (and final) Form A submission concerning the Agreement on September 7, 2019.

When it became clear the Agreement would not be approved by the Commissioner in time to avoid the $50 million "breakup fee," Menzies attempted to avoid the California regulatory process altogether by consummating the Agreement without CDI approval. Menzies sought to effect a merger (the "Merger") between CIC I, which he now purported to control, and a newly-formed New Mexico corporation, Appellant California Insurance Company ("CIC II"). This newly formed corporate insurer was not subject to California insurance regulations.

Menzies negotiated a ten-day Agreement deadline extension with Berkshire, at a cost of $10 million. On October 9, 2019, one day before the extended deadline was set to expire, the CDI notified Menzies that if the Merger were to be consummated without the approval of the CDI, "[CIC I] will cease to exist and [CIC II will be] an unlicensed insurer [] precluded from transacting the business of insurance in California." The uncertain fate of the Merger notwithstanding, the Agreement between Berkshire and Menzies closed on October 10, 2019, with CIC I becoming wholly owned by Menzies.

On November 4, 2019, before the CIC I/CIC II Merger could be completed, and without notice given to Appellants, the Commissioner filed an ex parte conservation application in the Superior Court of San Mateo which sought "an order appointing him as conservator of [CIC I]." The conservation application was based on the Commissioner's allegation that Menzies had not "filed and obtained written approval of the Commissioner" to consummate the Merger, in violation of California Insurance Code § 1215.2(d).

Also on November 4, 2019, again without any notice to Appellants, the Superior Court granted the Commissioner's conservation application, appointing California Insurance Commissioner Ricardo Lara as the Conservator of CIC I. In justifying lack of notice to Appellants, the Superior Court explicitly found

> that the Commissioner has . . . established good cause to believe that the State of California would be prejudiced were it to provide respondent advanced notice of this proceeding in that [CIC I] has within its authority power to at any time complete the ostensible consummation of the transaction,

> which would have the effect of at least forfeiting [CIC I's] certificate of authority, rendering California policyholders ostensibly insured by an out-of-state insurer without authority to transact insurance in California . . . .

CIC I subsequently contested, unsuccessfully, the grounds upon which the conservatorship was instituted. Specifically, on March 12, 2020, CIC I filed an application to vacate the conservatorship with the Superior Court, arguing that: 1) the conservatorship was obtained under false pretenses; 2) the conditions cited for imposing the conservatorship no longer existed; 3) the Commissioner acted arbitrarily, capriciously, and in bad faith; and 4) the conservatorship continues to harm CIC I. After an August 6, 2020 hearing at which CIC I appeared by counsel, the Superior Court denied CIC I's application to vacate the conservatorship on August 11, 2020, for the following reasons:

> Respondents attempted to take [CIC I] and its assets out of California via a merger without adequate protection of policyholders and the public and the Conservatorship was ordered on those grounds. Respondents have failed to demonstrate that the conditions necessitating conservation no longer exist. In light of Respondent's prior conduct, the Conservation Order ensures that Respondents do not again attempt to take [CIC I] and its assets out of California . . . [and] the Commissioner's preference to pursue a Rehabilitation Plan [for CIC I] is reasonable and sufficient under the circumstances.

Following this denial, CIC I filed an application for interlocutory appellate review with the California Court of Appeal, which was also denied. The record does not demonstrate whether a writ was sought from the California Supreme Court. On October 19, 2020, the Commissioner filed a proposed Rehabilitation Plan ("Rehabilitation Plan") with the Superior Court which articulated the terms he would accept to end the conservatorship of CIC I. CIC I has refused to accept the Commissioner's stated terms, so the conservatorship proceedings remain ongoing.

After CIC I had unsuccessfully challenged the bases of the conservatorship in state court, Appellants Applied and CIC II filed separate actions in federal court, asserting causes of action under 42 U.S.C. § 1983 alleging various constitutional violations ("the federal actions"). Appellants sought, among other forms of relief, orders "declaring the Commissioner's actions, as alleged, violate [Appellants'] rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution." Appellants also sought orders "directing the Commissioner to take all necessary steps to end [CIC I's] conservatorship pursuant to California Insurance Code § 1012, and enjoining the Commissioner from continuing the conservation." The district court dismissed both actions pursuant to Federal Rule of Civil Procedure 12(b)(1), with each order holding that the district court lacked jurisdiction to hear the cases under both the "prior exclusive jurisdiction" rule and the *Younger* abstention doctrine.

## II. STANDARD OF REVIEW

A district court's determination of subject matter jurisdiction, including its application of the prior exclusive jurisdiction rule, is reviewed de novo. *Chapman v. Deutsche Bank Nat. Trust Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011).

A district court's determination to apply *Younger* abstention is reviewed de novo. *Bean v. Matteucci*, 986 F.3d 1128, 1132 (9th Cir. 2021).

## III. ANALYSIS

### A. *Younger* abstention is not proper in an action challenging an insurance conservatorship

In "exceptional circumstances," the *Younger* abstention doctrine instructs federal courts to decline to hear a case when a parallel state proceeding is ongoing. *New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 368 (1989). *Younger* abstention is rooted in "the basic doctrine of equity jurisprudence that courts of equity should not act . . . to restrain a *criminal* prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43–44 (1971) (emphasis added). Following a period of continuous expansion, including to some civil proceedings, the Supreme Court firmly cabined the scope of the doctrine, holding that *Younger* applies only to three categories of cases (the *NOPSI* categories): 1) "ongoing state criminal prosecutions"; 2) "certain civil enforcement proceedings"; and 3) "civil proceedings involving certain orders . . . uniquely in the furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (cleaned up). If a state proceeding falls into one of these three categories, *Younger* abstention is applicable, but only if the three additional factors laid out in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432 (1982) are also met: that the state proceeding is 1) "ongoing"; 2) "implicate[s] important state interests"; and 3) "provide[s] adequate opportunity . . . to raise constitutional challenges." *Herrera v. City of*

*Palmdale*, 918 F.3d 1037, 1044 (9th Cir. 2019) (quoting *Middlesex*, 457 U.S. at 432) (cleaned up).

Here, the district court found that the Superior Court insurance conservatorship was a "civil enforcement proceeding" sufficient to warrant *Younger*, and that the three *Middlesex* factors were met. This holding was in error.

The hallmark of the civil enforcement proceeding category for *Younger* purposes is that such proceedings are "akin to a criminal prosecution" in "important respects." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). As noted in *Sprint*,

> Such enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act. In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges.

*Sprint*, 571 U.S. at 79–80 (citations omitted). Admittedly, the current situation bears *some* resemblance to a criminal prosecution. Here, the insurance conservatorship was brought by the Commissioner "acting under and within [the] police power" of the state of California pursuant to California Insurance Code § 1011. *Carpenter v. Pac. Mut. Life Ins. Co. of Cal.*, 10 Cal. 2d 307, 331 (1937). Specifically, the ex parte application alleged that, upon an investigation of the Commissioner, "Menzies's attempt to merge [CIC I] into and with CIC II without having filed and obtained written approval of the Commissioner to merge [CIC I] into a New Mexico domestic insurer is ground for

conservation of an insurer pursuant to section 1011." Moreover, as noted above, in reviewing CIC I's challenge to vacate the conservation order, the Superior Court found that "Respondents attempted to take [CIC I] and its assets out of California via a merger without adequate protection of policyholders and the public and the Conservatorship was ordered on those grounds. Respondents have failed to demonstrate that the conditions necessitating conservation no longer exist." It was on these grounds that the district court found the conservatorship was a "civil enforcement action" sufficient to merit *Younger* abstention.

This insurance conservatorship, however, cannot be said to have been brought "to sanction the federal plaintiff . . . for some wrongful act," *Sprint*, 571 U.S. at 79, which is the quintessential feature of a *Younger*-eligible "civil enforcement action." Indeed, in every case of the civil enforcement genre cited by *Sprint* where *Younger* abstention was found to be valid, the parallel proceedings were either "in aid of and closely related to criminal statutes," *Huffman*, 420 U.S. at 604, or were aimed at punishing some wrongful act through a penalty or sanction, *see, e.g.*, *Ohio Civ. Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 629 (1986) (state-initiated administrative proceedings to enforce state civil rights laws, noting "potential sanctions for the alleged sex discrimination"); *Middlesex*, 457 U.S. at 427, 433–34 (state-initiated disciplinary proceedings against lawyer for violation of state ethics rules, noting the availability of "private reprimand" and "disbarment or suspension for more than one year"); *Moore v. Sims*, 442 U.S. 415, 419–20, 423 (1979) (state-initiated proceeding to gain custody of children allegedly abused by their parents, noting the action was "in aid of and closely related to criminal statutes"); *Trainor v. Hernandez*, 431 U.S. 434, 435, 444 (1977) (civil proceeding "brought by

the State in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud, "a crime under Illinois law"); *Huffman*, 420 U.S. at 596–98 (state-initiated proceeding to enforce public nuisance laws, which provided for "closure for up to a year of any place determined to be a nuisance," "preliminary injunctions pending final determination of status as a nuisance," and "sale of all personal property used in conducting the nuisance").

Here, the complete lack of sanctions being sought against Appellants belie any punitive character to the insurance conservatorship action. This feature underscores why *Younger* abstention is not proper in this case. As noted long ago by the California Supreme Court, in an insurance conservatorship brought under the California Insurance Code,

> [t]he commissioner [is] not prosecuting an action "for the enforcement or protection of a right," or for the "redress or prevention of a wrong," or for the "punishment of a public offense." The proceeding [is] had under sections 1010 to 1061 of the Insurance Code which specially deal with the rehabilitation and liquidation of insurance companies. Those sections set up a comprehensive statutory scheme to accomplish those results. The proceeding is not one in which another party is prosecuting another party at all. It is simply a proceeding in which the state is invoking its power over a corporate entity permitted by the state to engage in a business vitally affected with the public interest upon

condition of continuing compliance with the
requirements provided by the state.

*Carpenter*, 10 Cal. 2d at 327.

To be sure, the nature of the conservatorship in
*Carpenter* was insolvency, *id.* at 315, not one like here,
where CIC I was, and appears to remain, a financially viable
entity.   Notably, Appellants contend that, before this
contested conservatorship, insurance conservatorships in
California have usually been brought only when a firm has
become insolvent or was at risk of becoming insolvent.
Nonetheless, it is immaterial for *Younger* purposes that here,
the conservatorship was brought because of an attempt by
CIC I to consummate an unapproved sale of controlling
interest and merger and to move the company's assets out of
state, instead of for reasons of insolvency.

For one, as in conservatorships brought on by a firm's
insolvency, the Commissioner's actions here were motivated
by the purpose of ensuring "adequate protection of
policyholders and the public."   As the Commissioner's
conservatorship application explained, if CIC I were
"permitted to consummate" the Merger, then CIC I
policyholders in California might "be left holding policies of
a non-admitted insurer," such that "policyholders, including
employees with serious work-related injuries and other
claimants entitled to vital and necessary insurance benefits,
may not have recourse to benefits."   Thus, as with a
conservatorship brought on by insolvency, the CIC I
conservatorship is not a proceeding aimed at "punishment of

a public offense" but rather one "by the state in the interest of the public." *Id.* at 327.**[3]**

Moreover, insolvency is itself often driven by acts that are in disregard of the public interest, as is an unapproved sale of controlling interest and concomitant merger attempt. Yet the disregard-of-public-interest factor alone does not impart those acts with the requisite "wrongful" nature such that punitive sanctions are merited. Indeed, in *Carpenter*, the noted insolvency had a readily identifiable cause: "that the hazardous and insolvent condition is principally caused by reason of the fact that for many years the company has issued a large number of noncancellable accident and health policies . . . at a rate inadequate to maintain the lawful reserves behind such policies." *Id.* at 315. Even though the insolvency was brought on because of clearly identifiable imprudent acts by the managers of the insolvent firm, these imprudent acts in no way impacted the California Supreme Court's analysis that the conservatorship was not brought to prosecute "an action for the enforcement or protection of a right, or for the redress or prevention of a wrong, or for the punishment of a public offense." *Id.* at 327 (internal quotation marks omitted).

---

**[3]** As noted by the concurrence, "individualized inquiries into motive are not part of [the *Younger*] analysis," citing *Bristol-Meyers Squibb Co. v. Connors*, 979 F.3d 732, 737 (9th Cir. 2020). We agree. However, this fact cuts *against* the concurrence's argument, given that, as demonstrated above, conservatorships are fundamentally brought "by the state in the interest of the public," and not for the "punishment of a public offense." *Carpenter*, 10 Cal. 2d at 327. It is only after attempting to divine the Commissioner's true motive in bringing the conservatorship of CIC I that the concurrence is able to determine that *this* conservatorship is a sanction.

We therefore decline to extend the class of "civil enforcement proceedings" sufficient to warrant application of *Younger* to actions divorced from a quasi-criminal context. *See Sprint*, 571 U.S. at 81. Accordingly, the district court's application of the *Younger* abstention doctrine to this case was in error.[4] Nonetheless, dismissal of Appellants'

---

[4] Appellees contend that in addition to falling within the "civil enforcement action" *NOPSI* category, insurance conservatorships also fall within the category of "civil proceedings involving certain orders that are uniquely in the furtherance of the state courts' ability to perform their judicial functions." 491 U.S. at 368. This argument is meritless. This third category has been explained to stand "in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13 (1987) (cleaned up), and has been applied by the Supreme Court to require federal abstention in order to avoid interfering with civil contempt orders, *Juidice v. Vail,* 430 U.S. 327, 336 n. 12 (1977), and to avoid interfering with state requirements to post bond pending appeal, *Pennzoil Co.*, 481 U.S. at 3, 18. The district court correctly found that the insurance conservatorship does not implicate "the regular operation of [a state court's] judicial system" with respect to "the processes by which the State compels compliance with the judgements of its courts," *Pennzoil Co.*, 481 U.S. at 13–14 (cleaned up), and that it is therefore not within the scope of this category.

Appellees' argument that *Worldwide Church of God, Inc. v. California*, 623 F.2d 613 (9th Cir. 1980) (per curiam), demands otherwise is unpersuasive. *Worldwide Church* conforms with the established proposition that *Younger* applies to certain "civil *enforcement* actions," as at issue in that case was the court-ordered imposition of a permanent receivership of a church allegedly engaged in the fraudulent distribution of charitable donations to the personal accounts of those who controlled the church. *Id.* at 614–15 (emphasis added). Notably, *Worldwide Church* was decided before *Middlesex*, *Pennzoil*, *NOPSI*, or *Sprint* were decided and so does not reflect *NOPSI*'s and *Sprint*'s cabining of *Younger* to the three distinct "exceptional circumstances" described above. *NOPSI*, 491 U.S. at 368. And, in any event, *Worldwide Church* did not cite *Juidice* or purport to extend the logic of *Juidice*'s abstention holding beyond proceedings that lie "at the

claims was warranted on account of the prior exclusive jurisdiction rule.

## B. The prior exclusive jurisdiction rule bars federal interference

"[T]he ancient and oft-repeated . . . doctrine of prior exclusive jurisdiction [holds] that when a court of competent jurisdiction has obtained possession, custody, or control of particular property, that possession may not be disturbed by any other court." *State Eng'r v. S. Fork Band of Te-Maok Tribe of W. Shoshone Indians*, 339 F.3d 804, 809 (9th Cir. 2003) (cleaned up). Said another way, where one court first takes proper *in rem* jurisdiction over a res, another court "is precluded from exercising its jurisdiction over the same res." *Kline v. Burke Const. Co.*, 260 U.S. 226, 229 (1922); *see also Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466–67 (1939).

As a threshold matter, the application at the heart of this case seeking an insurance conservatorship was first filed on November 4, 2019, and the conservatorship of CIC I was granted on the same day. The federal actions currently on appeal were first filed on October 20, 2020 (Applied action) and January 6, 2021 (CIC II action). Therefore, if both the insurance conservatorship and the federal actions are either *in rem* or *quasi in rem* proceedings, the prior exclusive jurisdiction rule applies to bar the federal actions, subject to the limited exceptions we announce below.

---

core of the administration of a State's judicial system." *Juidice*, 430 U.S. at 335.

### 1. The insurance conservatorship is an in rem proceeding

Looking to the insurance conservation order itself, the Superior Court asserted *in rem* jurisdiction over CIC I by authorizing the Conservator to take title to CIC I:

> 11. The Conservator is authorized in his or her discretion to take possession of any and all assets of [CIC I], including books, records, property (both real and personal), accounts, safe deposit boxes, rights of action, and all such assets as may be in the name of [CIC I], wheresoever situated.

> 12. Title to all property and assets of [CIC I], designated by the Conservator in his or her discretion, including deposits, securities, contracts, rights of actions, books, records, and other assets of every type and nature, and including both those presently in [CIC I's] possession and those that may be discovered hereafter, wheresoever situated, that are necessary or appropriate for the orderly conservation of [CIC I] is to be vested in the Conservator or his or her successor in office, in his official capacity as Conservator. The Conservator is authorized to deal with such assets in his or her own name as Conservator or in the name of [CIC I], and all persons are enjoined from interfering with Conservator's possession and title to such assets.

Appellants challenge this view, contending that because title to CIC I was vested in the Commissioner instead of the

Superior Court itself, the conservatorship is not properly understood as proceeding *in rem*. This view is unpersuasive, for two reasons. First, it ignores the Superior Court's own explicit assertion of *in rem* jurisdiction over CIC I:

> **11. Powers of the Court and the Conservator.** This Court shall continue to assert and to maintain sole and exclusive jurisdiction, to the exclusion of all other courts or tribunals, over and to all assets of [CIC I] of whatsoever kind or nature and wherever or however owned or held.

Second, *United States v. Bank of New York & Trust Co.*, 296 U.S. 463 (1936) forecloses Appellants' argument. There, the Court noted that while "the state court directed the superintendent of insurance to take possession of the assets" of the conserved insurance firms, "[t]he proceeding was essentially one *in rem*," *id.* at 475, later noting that "the superintendent still holds possession by virtue of [the state court's] authorization, and the res thus remains under the court's jurisdiction," *id.* at 476.

*Garamendi v. Executive Life Insurance Co.*, 17 Cal. App. 4th 504 (1993), further supports the *in rem* classification here. *Garamendi* considered an appeal of a Superior Court order in an insurance conservatorship arising under California Insurance Code § 1011. *Id.* at 508–09. The conservatorship concerned assets of a limited partnership in which the insurance company under conservatorship owned a 92% interest. *Id.* at 509. *Garamendi* held that the insurance company under conservatorship and the affected limited partnership shared an "identity of interest" sufficient to give the Superior Court jurisdiction over the limited partnership's assets pursuant to the original conservation

order.  *Id.* at 523.  In doing so, *Garamendi* explicitly categorized the Superior Court's jurisdiction in that action as *in rem*.  *Id.*  This view was subsequently endorsed by this Court in *Morgan Stanley Mortgage Capital Inc. v. Insurance Commissioner,* 18 F.3d 790, 792 (9th Cir. 1994).

Based on the cited cases, the state court insurance conservatorship here challenged is one proceeding *in rem*.

### 2. *The federal actions are either in rem or quasi in rem proceedings*

In form, the federal actions are *in personam* actions asserting claims under 42 U.S.C. § 1983 directed against certain state officials.  However, *State Engineer* instructs courts to look "behind the form of the action to the gravamen of a complaint and the nature of the right sued on" when determining the true jurisdictional nature of a case.  339 F.3d at 810 (cleaned up).

Here, in both federal actions, the gravamen of the complaint is directed at ending the conservatorship's control over CIC I's assets:

> **PRAYER FOR RELIEF**
>
> WHEREFORE, in connection with the preceding paragraphs, Plaintiffs respectfully request that the Court enter judgment in their favor against Defendants, and award the following relief:
>
> A. An Order declaring the Commissioner's actions, as alleged, violate Plaintiffs' rights to due process and equal protection under the

Fourteenth Amendment to the United States Constitution;

B. An Order declaring the Commissioner's actions, as alleged, constitute a violation of the Dormant Commerce Clause and an unlawful taking of Plaintiffs' property interests in violation of the Fifth and Fourteenth Amendments to the United States Constitution;

C. An Order directing the Commissioner to take all necessary steps to end CIC's conservatorship pursuant to California Insurance Code § 1012, and enjoining the Commissioner from continuing the conservation;

Appellants' prayers for relief seeking declaratory orders also seek to interfere with the state court's control over the CIC I res, imparting an inherently *in rem* nature to the federal actions.

Moreover, in *State Engineer*, the Court rejected Appellants' argument that the underlying "contempt actions [were] *in personam* rather than *in rem*," 339 F.3d at 810, recognizing that "the contempt action was brought to enforce a decree over a res," *id.* at 811. In this respect, *State Engineer* mirrors the instant federal actions, which, as noted above, seek "necessarily [to] interfere with the jurisdiction or control by the state court over the res"—here, the assets of CIC I. *Bank of N.Y.*, 296 U.S. at 478. Similarly, in *Bank of New York*, although the underlying complaints were brought by the United States in form as *in personam* actions in "accounting and delivery" against two New York banks

concerning the United States' claim to ownership over certain funds, *id.* at 470, the Supreme Court looked through the form of the actions to observe that "the object of the suits is to take the property from the depositaries and from the control of the state court, and to vest the property in the United States to the exclusion of all those whose claims are being adjudicated in the state proceedings," *id.* at 478, and were thus *in rem* proceedings.

For these reasons, the federal actions are necessarily proceeding either *in rem* or *quasi in rem*. And as the state court insurance conservatorship is also one proceeding *in rem* and was filed first, it appears the federal actions must be dismissed.

### 3.  *Prior exclusive jurisdiction and 42 U.S.C. § 1983*

This case does, however, have a unique and important feature. To our knowledge, it is the first case in this Court implicating the prior exclusive jurisdiction rule in connection with a 42 U.S.C. § 1983 action.[5] And as it is currently formulated in the caselaw, the prior exclusive jurisdiction rule presents as an absolute bar to federal court involvement in state court suits when both suits are either *in rem* or *quasi in rem*, regardless of the presence of any claimed deprivations of constitutional rights occurring in the

---

[5] In a recent unpublished decision, the Third Circuit considered a 42 U.S.C. § 1983 action which also implicated the prior exclusive jurisdiction rule, finding that the prior exclusive jurisdiction rule barred jurisdiction in that case. *Dyno v. Dyno*, No. 20-3302, 2021 WL 3508252, at *2 (3rd Cir. Aug. 10, 2021) (referring to the prior exclusive jurisdiction rule as "the *Princess Lida* doctrine," citing *Princess Lida*, 305 U.S. at 466).

initial action.[6]   Accordingly, we take occasion to discuss limitations on the prior exclusive jurisdiction rule that may be necessary in unusual circumstances in which the adjudication of constitutional rights might be compromised, but conclude that this case does not present any such circumstances.

At core, abstention doctrines are rooted in policy considerations which allow federal courts to exercise "discretion in determining whether to grant certain types of relief—a discretion that was part of the common-law background against which the statutes conferring jurisdiction were enacted." *NOPSI*, 491 U.S. at 359. Accordingly, "there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is 'the normal thing to do.'" *Id.* (quoting *Younger*, 401 U.S. at 45). Still, abstention is only "the normal thing to do" in "exceptional circumstances." *Sprint*, 571 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368). Such "exceptional circumstances" have been generalized to embody situations "where denying a federal forum would clearly serve an important countervailing interest, for example, where abstention is warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (cleaned up). "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state

---

[6] To be sure, the prior exclusive jurisdiction rule applies with equal force in prohibiting a state court from interfering with a federal court that first takes *in rem* or *quasi in rem* jurisdiction over a disputed res. *See, e.g., United States v. Alpine Land & Reservoir Co.*, 174 F.3d 1007, 1012–14 (9th Cir. 1999).

policies, whether the policy relates to the enforcement of the criminal law, or the administration of a specialized scheme for liquidating embarrassed business enterprises, or the final authority of a state court to interpret doubtful regulatory laws of the state." *Id.* at 717–18 (quoting *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496, 500 (1941)). And to be sure, "[s]tates, as a matter of tradition and express federal consent, have an important interest in maintaining precise and detailed regulatory schemes for the insurance industry." *Id.* at 733 (Kennedy, J., concurring) (citing McCarran-Ferguson Act, Pub. L. No. 79-15, 59 Stat. 33 (1945) (codified as amended at 15 U.S.C. § 1011 *et seq.*)).

Standing in contrast to the abstention doctrines, *Ex parte Young*, 209 U.S. 123 (1908), and its progeny explicitly permit injunctions against state officials preventing them from prosecuting criminal actions "where the danger of irreparable loss is both great and immediate," *Younger*, 401 U.S. at 45 (quoting *Fenner v. Boykin*, 271 U.S. 240, 243 (1926)). Notably, *Younger* itself refused to extend *Ex parte Young* to enjoin a prosecution that "was already pending in the state court" and which afforded the moving party "an opportunity to raise his constitutional claims." *Id.* at 49. The *Younger* Court emphasized that "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it, and that [the party seeking the injunction] failed to make any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Id.* at 54.

With this background, it is clear that abstention under the prior exclusive jurisdiction rule can be proper even though the federal action asserts a 42 U.S.C. § 1983 claim. By maintaining otherwise, Appellants ask this Court to craft a broad, *Ex parte Young*-type exception to the prior exclusive

jurisdiction rule for any 42 U.S.C. § 1983 action brought against state officials when such suits seek to enjoin an ongoing state court *in rem* proceeding. This we shall not do.

Nor are there any special circumstances in this case justifying a limitation on the prior exclusive jurisdiction rule. Appellants first argue in this regard that they are unable to present any objections in the insurance conservatorship at all, given that they are not parties to that action. However, Appellants' interests are well represented in the conservatorship action, given that each of CIC I, CIC II, and Applied are all subject to the common management and control of Steven Menzies and Jeffrey Silver.[7] Further, as noted by the district court, any party with a material interest in CIC I has been "expressly invited . . . to submit any objections—constitutional or otherwise—they have to the Proposed Rehabilitation Plan in writing and orally at the hearing on the Commissioner's application to approve the Plan."

Appellants next argue that certain procedural characteristics of the conservatorship proceeding will prevent them from adequately raising their constitutional claims, alleging that "the limitations of conservation

---

[7] Here, an analogy exists to *Younger* abstention principles. Supreme Court precedent holds that *Younger* abstention is applicable when nominally distinct parties to the state and federal actions are nonetheless "so closely related that they should all be subject to the *Younger* considerations which govern any one of them." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975). Moreover, in *Herrera v. City of Palmdale*, 918 F.3d 1037 (9th Cir. 2019), this Court held that *Younger* abstention was applicable where the state action was brought against a corporation while the federal action was brought by the co-founders of the corporation and their family, *id.* at 1041, 1047. Appellants offer no reasons why these same considerations should not apply in the prior exclusive jurisdiction analysis.

proceedings under California law foreclose any realistic ability for Appellants to develop and present fact-based constitutional claims hinging on proof of motive and conduct rather than the facial validity of a law." However, state caselaw firmly establishes the contrary—that Appellants do have adequate opportunity to raise constitutional challenges in insurance conservatorship proceedings. *Carpenter*, the earlier mentioned California Supreme Court case, for example, reviewed arguments "that the provisions of the Insurance Code dealing with rehabilitation of insolvent insurance companies were unconstitutional in that they violated the due process, equal protection of the law, and the contract clauses of the Federal Constitution." *Carpenter*, 10 Cal. 2d at 328–32.[8] *Rhode Island Insurance Co. v. Downey*, 95 Cal. App. 2d 220 (1949), considered a "[p]etition for a writ of mandate directing the superior court to vacate its 'Order Appointing Conservator and Restraining Order' in a proceeding brought against petitioner by respondent Insurance Commissioner of the State of California" which argued "that to make the application of statutes providing for summary seizure constitutional there must be a reasonable necessity for taking, coupled with an adequate remedy giving the company whose assets are seized the right to show that the seizure was unnecessary and unjustified," *id.* at 223, 238–39. And *In re Executive Life Insurance Co.*, 32 Cal. App. 4th 344 (1995), considered the appellants' "claim that the nature of the confirmation hearing on the modified [rehabilitation] plan denied them their First Amendment rights of speech and petition," *id.* at 391.

To the extent that Appellants are genuinely unable to raise fact-based "claims of unconstitutional retaliation" "for

---

[8] *Carpenter* was then further affirmed by the U.S. Supreme Court in *Neblett v. Carpenter*, 305 U.S. 297 (1938).

[CIC I's] and Appellants' First Amendment activity," there would unquestionably be a proper due process challenge under the Fourteenth Amendment to the facial validity of the relevant provisions of the California Insurance Code, a challenge the Superior Court, Court of Appeals, and California Supreme Court are able to pass upon, as thoroughly demonstrated by the California state caselaw cited above.[9]   Indeed, due process challenges have been raised in CIC I's application for interlocutory appellate review with the California Court of Appeal.  Specifically, CIC I asserted in its petition for writ of mandate or other relief that the "Superior Court's Failure to Conduct a Full Hearing And to Construe the Relevant Statute Was Legal Error And Violated the Express Terms of Section 1012 and [CIC I's] Right to Due Process."  And as stated above, CIC I filed an application to vacate the conservatorship with the Superior Court, arguing that: 1) the conservatorship was obtained under false pretenses; 2) the conditions cited for imposing the conservatorship no longer existed; 3) the Commissioner acted arbitrarily, capriciously, and in bad faith; and 4) the conservatorship continues to harm CIC I. Contrary to Appellants' representation that "the Superior Court concluded that state law forecloses any scrutiny of Appellees' choice to pursue a conservation over an injunction," the Superior Court explicitly found, on the merits, that "the Commissioner's preference to pursue a Rehabilitation Plan is reasonable and sufficient under the circumstances," evincing that the Superior Court considered

---

[9] Just as in *Younger*, whether the party seeking to enjoin ongoing proceedings has "an adequate opportunity to raise constitutional claims" "does not turn on whether the federal plaintiff actually avails himself of the opportunity to present federal constitutional claims in the state proceeding, but rather whether such an opportunity exists." *Herrera*, 918 F.3d at 1045–46.

CIC I's arguments of whether the Commissioner was justified in pursuing a conservatorship over an injunction.

We will also consider, as in *Younger* cases, "bad faith" and "irreparable injury" exceptions to the otherwise valid application of the prior exclusive jurisdiction rule. In the context of *Younger*, "bad faith 'generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction.'" *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 621 (9th Cir. 2003) (quoting *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975)). Such "bad faith" might arise in cases involving "repeated harassment by enforcement authorities with no intention of securing a conclusive resolution" or where there is evidence of "pecuniary bias by the tribunal." *Partington v. Gedan*, 961 F.2d 852, 861–62 (9th Cir. 1992). The Second Circuit has provided the following helpful guidance for determining what constitutes an allegation of "bad faith": "it is only when the state proceeding is brought *with no legitimate purpose* that [the] state interest in correcting its own mistakes dissipates" and the "bad faith" exception to *Younger* applies. *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 200 (2nd Cir. 2002) (emphasis added).

Moreover, the Supreme Court in *Hicks v. Miranda*, 422 U.S. 332 (1975), stated that where there are allegations of "repeated judicial authorization" for the alleged bad faith conduct of the federal defendant, "we cannot agree that bad faith and harassment were made out" unless there is an allegation that the judicial authorization itself was steeped in the bad faith actions of the judicial officers involved, *id.* at 351.

In view of these teachings, it is clear there are no sufficient allegations of "bad faith" here to merit an exception to the valid application of the prior exclusive

jurisdiction rule.  As previously noted, the conservatorship action was brought for a legitimate reason—indeed, Appellants' own factual allegations make out a violation of § 1215.2(d) sufficient to trigger a conservatorship under § 1011(c).  The allegations make clear that Appellants neither sought nor received approval from the CDI for the proposed purchase of the controlling interest in CIC I and the concomitant CIC I / CIC II merger, as required by California Insurance Code § 1215.2(d), and that the merger was an obvious attempt to avoid the California insurance regulatory regime.  It is possible to imagine a hypothetical situation in which the Commissioner is seeking, through his proposed Rehabilitation Plan, favorable settlements for politically allied recipients to compensate for past and future political contributions, or improper kickbacks for himself from settlement recipients or others who may conceivably be favored by other provisions of the proposed Rehabilitation Plan.  This sort of skullduggery could make out a viable bad faith claim *against the Commissioner*.

Before the district court below, Appellants did make some allegations vaguely to that effect, at least implicitly.[10] However, Appellants' allegations do not suggest that the Commissioner acted "with no intention of securing a conclusive resolution." *Partington*, 961 F.2d at 862.  What is more, an allegation of "bad faith" is not a talisman sufficient to overcome an otherwise proper exercise of abstention.  For purposes of fashioning a "bad faith"

---

[10] Appellants asserted, among other claims, that Appellees "are using their broad state conservation powers as a club to force settlement by parties in private litigation that *they want policyholders and their attorneys to win*."  Why they wanted those parties to win—for some nefarious purpose, or because those parties were entitled to prevail—was not spelled out.

exception to the application of the prior exclusive jurisdiction rule, in addition to the due process exception already outlined, by analogy to *Younger*, Appellants in these circumstances—where state officials have sought and received "repeated judicial authorization for their conduct"—must allege that the *state court itself* is part of the Commissioner's bad faith scheme, or is otherwise acting in bad faith to deprive Appellants of a fair chance to litigate the propriety of the exercise of *in rem* jurisdiction.  *Hicks*, 422 U.S. at 351.  Appellants have failed to make such allegations.[11]

Likewise, Appellants have failed to demonstrate "irreparable injury" arising from "extraordinary circumstances" which might justify an exception to the prior exclusive jurisdiction rule.  In the context of *Younger*, as noted by the district court, "such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation."  *Moore v. Sims*, 442 U.S. 415, 433 (1979)

---

[11] To be clear, where the state officials have sought and received judicial authorization for their conduct, the necessity of bad faith allegations against the Superior Court itself cannot be understated. Simply alleging that the Superior Court made an incorrect ruling, even a "clear error," is not sufficient to defeat an otherwise proper application of abstention.  A respect for federalism demands as much.  Appellants can seek review of the Superior Court's decision in the California Court of Appeals, the California Supreme Court, and ultimately, the Supreme Court of the United States.  Without specific allegations that the Superior Court is itself acting in bad faith, this federal tribunal must respect the competency of the parallel state court system to correct any mistakes of law that are made in that system.  "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights."  *Middlesex*, 457 U.S. at 431 (emphasis in original).

(quoting *Kugler v. Helfant*, 421 U.S. 117, 125 (1975)).  Two recent Ninth Circuit cases have found "extraordinary circumstances" giving rise to "irreparable injury" sufficient to satisfy the exception to *Younger*.  *Bean v. Matteucci*, 986 F.3d 1128 (9th Cir. 2021), held that an individual's "due process right to avoid forcible administration of antipsychotic medications" was a harm that "cannot be fully vindicated after trial," *id.* at 1134–35.  Likewise, *Arevalo v. Hennessy*, 882 F.3d 763 (9th Cir. 2018), held that where "petitioner has been incarcerated for over six months without a constitutionally adequate bail hearing," such a "[d]eprivation of physical liberty by detention constitutes irreparable harm," *id.* at 767.

Here, however, Appellants allege no such concrete irreparable harm.  Instead, Appellants allege only speculative harms that *may* arise *if* the Superior Court adopts the Commissioner's proposed Rehabilitation Plan.  Even then, Appellants will have ample opportunity to have that decision reviewed by appellate state courts.[12]

Moreover, Appellants' claims of "irreparable harm" suffer from a more fundamental defect.  As noted above, Appellants have sufficient ability to challenge the conservatorship in the Superior Court, which includes the ability to challenge the proposed Rehabilitation Plan.  If the Superior Court approves the Rehabilitation Plan, and the Rehabilitation Plan is then affirmed by the California Court

---

[12] Specifically, Appellants allege that "[t]he [irreparable] harm includes forced settlements of litigation rights, millions of dollars in lost property and assets, and nearly $100 million lost from the forced transfer of CIC's and Appellants' book of business to third parties.  And the best means of repairing that harm—damages—is unavailable because the relief would run against the state and thus is barred by the Eleventh Amendment."

of Appeals and the California Supreme Court, that properly obtained judgment would not be a legally cognizable "injury" for the purposes of § 1983 damages. So, although Appellants note the fundamental concept that damages against the state are generally barred by the Eleventh Amendment (notwithstanding California Government Code §§ 800–900 et seq.), a properly obtained judgment, even if adverse to Appellants' interests, cannot count as an "injury" to a party such that the inability to obtain damages supports federal injunctive relief. To hold otherwise would be to hold that a state official can properly act within his authority to impose a conservatorship on an insurance firm, propose a Rehabilitation Plan approved by the Superior Court, California Court of Appeals, and California Supreme Court, then, at the same time, be subject to damages by the unhappy owners and affiliates of the conserved insurance firm subject to the Rehabilitation Plan. This result would be absurd.

Appellants allege a final source of potential "irreparable injury" resulting from their present inability to service new CIC I policies while CIC I is under the conservatorship, thereby depriving Appellants of profits they would have otherwise realized. In the event the Superior Court or an appellate state court were to hold that the conservatorship was entirely unfounded, denying the Commissioner's proposed Rehabilitation Plan, returning all assets to CIC I's management, and allowing the Merger with CIC II to consummate, Appellants may well have suffered an "irreparable injury," given Appellants' uncertain ability to recover damages from the state. However, two reasons prevent this claim from representing an "irreparable loss [that] is both great and immediate" so as to merit an exception to an otherwise valid exercise of abstention. *Younger*, 401 U.S. at 45.

First, as previously stated, Appellants' own factual allegations make out a violation of § 1215.2(d) sufficient to trigger a conservatorship under § 1011(c). What is more, after the Commissioner's ex parte conservatorship application was granted, the propriety of the conservatorship has been twice affirmed, once by the Superior Court in denying CIC I's application to vacate the conservatorship, and once by the California Court of Appeals in denying CIC I's application for interlocutory appellate review of the Superior Court's denial of CIC I's application to vacate the conservatorship. Given this background, it seems highly unlikely Appellants would ever have any claim for recovery based on a theory that the conservatorship was impermissible.

Second, even in the event that the conservatorship is vacated in full as baseless, Appellants have not established that they would be categorically barred from relief under California Government Code §§ 800–900 et seq. Moreover, Appellants do not argue that the calculation of damages is impossible. To be sure, it is unclear whether the institution of a truly baseless conservatorship could serve as grounds for waiver of state sovereign immunity under that statute, but the possibility of such relief further underscores why Appellants' claim of "irreparable injury" is misplaced.

Accordingly, as Appellants have failed to allege here any true "irreparable injury" arising from "extraordinary circumstances," application of the prior exclusive jurisdiction rule requires federal judicial abstention in this case.

Of course, we do not acknowledge these limitations on the prior exclusive jurisdiction rule lightly, given the potential embarrassment of competing federal and state courts issuing injunctions against one another concerning

control of a disputed res.  However, if such a case were to arise where a state forum was irremediably depriving a litigant of his constitutional rights, then federal interference would be required, the prior exclusive jurisdiction rule notwithstanding.[13]  Indeed, if the initial proceeding were to be wholly repugnant to the Constitution, the state forum could not be said to have "competent jurisdiction" over the res.  *State Eng'r*, 339 F.3d at 809.  But this case in no way presents such an extraordinary situation.  Accordingly, federal judicial abstention due to the San Mateo Superior Court's prior exclusive jurisdiction of the CIC I res is warranted.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of the federal actions.

---

NGUYEN, Circuit Judge, concurring in the result:

I agree that we should affirm the district court's dismissal of these federal actions.  But I write separately because, in my view, the district court correctly dismissed under *Younger* abstention.  In rejecting this ground for dismissal, the majority holds that insurance conservatorships are not the type of civil enforcement proceedings to which

---

[13] In addition to the exceptions at issue in this case, federal jurisdiction may be appropriate, notwithstanding the prior exclusive jurisdiction rule, in a case involving enforcement of a statute that is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."  *Watson v. Buck*, 313 U.S. 387, 403 (1941).

*Younger* abstention applies.   To the contrary, insurance conservatorships embody all of the characteristics which define that category.

Instead of applying *Younger* abstention, the majority breaks new ground to determine how the prior exclusive jurisdiction doctrine should apply when a federal plaintiff asserts constitutional violations in a pending state court proceeding.   *Younger* addresses how federal courts should proceed in this situation, which explains why the majority must import aspects of *Younger* into its extension of the prior exclusive jurisdiction doctrine.   Rather than reinvent the wheel, I would apply *Younger*, which the majority's own analysis confirms is a better fit.

## I

## A

The Supreme Court has said that *Younger* only applies to civil enforcement proceedings that are "'akin to a criminal prosecution' in 'important respects.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013) (quoting *Huffman v. Pursue Ltd.*, 420 U.S. 592, 604 (1975)).   First, "enforcement actions are characteristically initiated to sanction the federal plaintiff . . . for some wrongful act."   *Id.*   Second, "a state actor is routinely a party to the state proceeding and often initiates the action."   *Id.*   Third, "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."   *Id.* at 79–80.

The majority does not dispute that the second and third of these characteristics are present in insurance conservatorships.   These characteristics are easily shown. The proceedings here can only be initiated by a state actor— California's Insurance Commissioner—who not only

remains a party to those proceedings but controls the insurer's assets and business while the action is pending. *See* Cal. Ins. Code § 1011; *Bristol-Myers Squibb Co. v. Connors*, 979 F.3d 732, 736 (9th Cir. 2020) (holding that a case was sufficiently state-initiated because it could only be brought by state officials), *cert. denied*, 141 S. Ct. 2796 (2021). And insurance conservatorships can only be initiated by filing a "verified application," a formal statement of allegations supporting relief, which obviously requires some prior investigation. *See* Cal. Ins. Code § 1011.[1]

The only issue is whether the first characteristic is present. The majority explains that the district court erred because "[t]his insurance conservatorship . . . cannot be said to have been brought 'to sanction the federal plaintiff . . . for some wrongful act,' *Sprint*, 571 U.S. at 79, which is the quintessential feature of a *Younger*-eligible 'civil enforcement action.'" Maj. Op. at 15. I strongly disagree. The Commissioner undoubtedly initiated the conservatorship "to sanction [CIC I] for some wrongful act." *Sprint*, 571 U.S. at 79. How could it be otherwise? The conservatorship was initiated as a direct response to CIC I's attempt to do an end-run around California's regulators by consummating an unapproved merger in brazen violation of California law and the Insurance Commissioner's direct warning. *See* Cal. Ins. Code §§ 1011(c), 1215.2(d).

Yet the majority concludes that the conservatorship lacks the requisite "punitive character" and "sanctions" to qualify

---

[1] I assume for argument's sake that these second and third characteristics are not sufficiently indicative of civil enforcement proceedings by themselves. *But see Bristol-Myers Squibb*, 979 F.3d at 737 ("Nothing in [*Sprint*] suggests that the characteristics it identified should be treated as a checklist . . . .").

as a civil enforcement proceeding. Maj. Op. at 16. But what would establish the requisite punitive character or sanction? The majority doesn't say. Appellants argue, and the majority appears to accept, that *Younger* abstention cannot apply when the purpose of a proceeding is to protect consumers and the public and rehabilitate the insured.

But a state proceeding can still be subject to *Younger* even if its purpose is to rehabilitate, to deter, or to protect the public. In *Middlesex*, the Supreme Court applied *Younger* abstention to attorney disciplinary proceedings even though the purpose of those proceedings was "the protection of the public, the purification of the bar and the prevention of a re-occurrence." 457 U.S. 423, 434 (1982) (citation omitted). No case suggests that disciplinary proceedings would become exempt from *Younger* abstention if they sought a primarily rehabilitative remedy – such as mandatory education or counseling – as opposed to disbarment or suspension. Such individualized inquiries into motive are not part of this analysis. *See Bristol-Myers Squibb*, 979 F.3d at 737 (rejecting "case-specific inquiry" into "the State's true motive in bringing [a] case"). *Middlesex* thus shows that proceedings geared towards "protection," "prevention," and even rehabilitation can have the requisite punitive character. 457 U.S. at 434; *see also Herrera v. City of Palmdale*, 918 F.3d 1037, 1045 (9th Cir. 2019) (applying *Younger* abstention to suit to abate conditions at a motel that "pose[d] a severe life and health and safety hazard to any occupants, nearby residents, and the public.").

Focusing on the remedies sought, it is also clear that insurance conservatorships are "sanctions." This characteristic of civil enforcement proceedings is supposed to be "akin to a criminal prosecution." *Sprint*, 571 U.S. at 79. In the criminal context, of course, sentences are

shaped by interests in deterrence, protection of the public, and rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(B)–(D). Civil enforcement proceedings accordingly remain akin to criminal prosecution even when their goal is in part to stop wrongful conduct and to protect the public from its consequences.

We have thus held that state-imposed receiverships, which have similar aims to conservatorships, can be sufficient sanctions to fall within *Younger*'s civil enforcement category. *See Herrera*, 918 F.3d at 1045 (holding that "the appointment of a receiver to take possession and control of the property" in a civil nuisance action was a "sanction[] . . . consistent with the enforcement actions described in *Sprint* . . . ."); *Worldwide Church of God, Inc. v. State of Cal.*, 623 F.2d 613, 614 (9th Cir. 1980) (per curiam) (holding that *Younger* abstention applied to a receivership imposed "to prevent diversion of Church assets from charitable purposes to the personal benefit of persons who controlled the Church."). Like these state-imposed receiverships, the Commissioner in conservation proceedings manages an insurer's property with a "fiduciary dut[y]" to protect interested stakeholders. John K. DiMugno & Paul E.B. Glad, *California Insurance Law Handbook* § 40.5 (2022). The Commissioner's "initial objective is almost always to rehabilitate the insolvent or delinquent insurer." *Id.* § 40.3. That its goals are protection and rehabilitation does not mean that court-ordered dispossession of an insurer's assets at the request of state officials does not amount to a sanction.

## B

The majority also appears to suggest that the "imprudent acts" of an insurer cannot be "wrongful conduct" of the severity that a criminal prosecution would redress. Maj. Op.

at 18. The majority provides no authority that *Younger* abstention should turn on the egregiousness of the conduct addressed by parallel state proceedings. Regardless, the Commissioner points out that some conduct triggering conservation proceedings, including the conduct in which CIC I engaged, can trigger criminal penalties under California law. *See* Cal. Ins. Code §§ 700(b), 1215.11(d), (f). And while short of what state law criminalizes, most of the conditions that authorize a conservatorship describe blatant malfeasance, such as defying orders of the Commissioner or violating conditions of practice as an insurer, *see* Cal. Ins. Code § 1011(a)–(c), (e)–(h), and are appropriately categorized by state law as "Proceedings in Cases of . . . Delinquency," *see id.* Div. 1, Pt. 2, Ch. 1, Art. 14. Even if it mattered that insurance conservatorships are usually brought to redress insolvency, *see id.* § 1011(d), (i), there is no reason why a state could not treat such conduct as worthy of sanction in a civil enforcement proceeding. In a highly regulated field such as insurance, conduct innocent in other contexts, such as running an insolvent business, can take on such a "grave and important interest" that "something must be done to remedy the situation." *Carpenter v. Pac. Mut. Life Ins. Co. of Cal.*, 74 P.2d 761, 775 (Cal. 1937).

The majority's only response to the concurrence – and to this analysis of the different reasons for bringing insurance conservatorships – is to mischaracterize it as an "individualized inquir[y]" into "the Commissioner's true motive in bringing the conservatorship of CIC I." Maj. Op. at 18 n.3. It is because "[t]hat kind of case-specific inquiry finds no support in precedent" that I (unlike the majority) examine Cal. Ins. Code § 1011 as a whole. *Bristol-Myers Squibb*, 979 F.3d at 737. That the facts of this case are so "akin to criminal prosecutions" only illustrates how far the

majority strays from the Supreme Court's characterization of civil enforcement proceedings. *Sprint*, 571 U.S. at 72.

## C

The majority gives great weight to a passage from the California Supreme Court's 1937 decision in *Carpenter*, stating that insurance conservatorships are "not brought to prosecute 'an action for the enforcement or protection of a right, or for the redress or prevention of a wrong, or for the punishment of a public offense.'" Maj. Op. at 18 (quoting *Carpenter*, 74 P.2d at 773). This quotation has little if any relevance to the issues in this case. *Carpenter* was quoting section 22 of the California Code of Civil Procedure, which simply defines "ordinary proceeding[s]" as distinct from "special proceeding[s]," which include conservatorships. *See* Cal. Code Civ. Proc. §§ 22–23. The statute was only quoted to answer a procedural question entirely unrelated to the characteristics of civil enforcement proceedings – whether the trial court was required to enter formal findings. *See Carpenter*, 74 P.2d at 773–774.

Perplexingly, the majority also purports to find support for its position in *Carpenter*'s statement that insurance conservatorships are "not a controversy between private parties but a proceeding by the state in the interest of the public." *Id.* at 774; *see* Maj. Op. at 17–18. That language strongly supports applying *Younger* abstention. *Younger*-eligible civil enforcement proceedings are characteristically initiated by the state, *see Sprint*, 571 U.S. at 79, and in order to qualify for *Younger* they must "implicate important state interests," *Middlesex*, 457 U.S. at 432. Moreover, *Carpenter*'s statement that conservatorships are "not a controversy between private parties," 74 P.2d at 774, clearly distinguishes them from purely private disputes that fall outside *Younger*'s reach. *See Sprint*, 571 U.S. at 80 (dispute

over fees between national and local telecommunications carriers); *Rynearson v. Ferguson*, 903 F.3d 920, 926 (9th Cir. 2018) (anti-stalking protection order sought by private party against another private party); *Cook v. Harding*, 879 F.3d 1035, 1040 (9th Cir. 2018) (challenge to enforcement of private surrogacy contract).

As *Carpenter* helps to confirm, all three characteristics that *Sprint* identified are present here. Insurance conservatorships are brought by the Commissioner, following an investigation that results in a formal allegation of wrongful conduct against an insurer, and they empower the Commissioner to impose measures that will protect the public from the insurer's misconduct, prevent recurrence, and rehabilitate the insurer. Under *Sprint*, insurance conservatorships are thus civil enforcement proceedings and *Younger* abstention applies.

## II

After rejecting the district court's conclusion on *Younger*, the majority articulates various limitations to the prior exclusive jurisdiction doctrine in the context of § 1983 actions. Maj. Op. at 26–37. As the majority recognizes, these limitations are drawn directly from *Younger* abstention. *See id.* at 27–34 & nn. 7, 9. The majority in effect runs through the remainder of the *Younger* analysis, and I fully agree with how the majority applies those limitations to the facts of this case.

That the majority finds it necessary to transplant *Younger* principles onto the prior exclusive jurisdiction doctrine is revealing. *Younger* abstention was developed to reconcile respect for state courts with the federal interest in enforcing constitutional rights. *See Middlesex*, 457 U.S. at 431 (explaining that a policy underlying *Younger* is that

"[m]inimal respect for the state processes . . . precludes any presumption that the state courts will not safeguard federal constitutional rights."). *Younger v. Harris* itself held that abstention was proper in a constitutional challenge to pending state proceedings because, in "vindicat[ing] and protect[ing] federal rights and federal interests," the federal government must "not unduly interfere with the legitimate activities of the States." 401 U.S. 37, 44 (1971). It is therefore unsurprising that the majority grafted aspects of the *Younger* abstention framework onto its prior exclusive jurisdiction analysis to grapple with these tensions.

In short, rather than applying a doctrine tailor-made for this situation, the majority instead attempts to modernize the "ancient" doctrine of prior exclusive jurisdiction. Maj. Op. at 20. Because I believe *Younger* abstention applies, I concur only in the result.